CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

JUL 0 2 2009

JOHN F. CORCORAN, CLERK
BY:
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| AMY GLESSNER ARNOLD | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 7:08CV00639 |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| LIFE INSURANCE COMPANY OF | ) |
| NORTH AMERICA, | ) By: Hon. Glen E. Conrad |
| | ) United States District Judge |
| Defendant. | ) |

In this action, brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., the plaintiff, Amy Glessner Arnold, claims that the defendant, Life Insurance Company of America ("LINA"), wrongfully terminated her waiver of premium coverage under a group life insurance policy issued by LINA. The case is presently before the court on the parties' cross-motions for summary judgment. For the reasons set forth below, LINA's motion will be granted and Arnold's motion will be denied.

### Factual and Procedural Background

In August of 1999, Arnold began working as a clinical education specialist for Alcon Laboratories, Inc. ("Alcon") in Orlando, Florida. As a benefit of her employment, Arnold was covered by a group life insurance policy issued by LINA.

Arnold stopped working for Alcon in October of 2001, because she was having difficulty breathing. She had been diagnosed with cystic fibrosis as a child, and the disease had progressed to the point that it was affecting her ability to work. Arnold subsequently underwent a double lung transplant at Duke University Medical Center on March 13, 2002.

Upon stopping work, Arnold applied for long term disability ("LTD") benefits under a separate policy issued by LINA. While the LTD claim was pending, LINA advised Arnold that she might also be eligible for waiver of premium coverage under the life insurance policy.

Pursuant to the life insurance policy, an employee, who is under the age of 60, is entitled to have her life insurance premium waived if her employment ends due to disability. In order to qualify for waiver of premium coverage, an employee must submit "due proof" that she has been disabled for the applicable benefit waiting period. (Administrative Record ("R.") at 934). After an employee's premiums have been waived for 12 months, they will be waived for future periods of 12 months, "if the [e]mployee remains [d]isabled and submits satisfactory proof that [d]isability continues." (R. at 934). An employee is "disabled," for purposes of the life insurance policy, "if, because of [i]njury or [s]ickness, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training, or experience." (R. at 945). The policy further provides that an employee's eligibility for waiver of premium coverage ends when the employee is no longer disabled. (R. at 934).

Arnold applied for waiver of premium coverage under the life insurance policy, and her claim was ultimately approved on April 28, 2002.[1] At the time her claim was approved, Arnold was advised that she "must continue to meet the [w]aiver of [p]remium disability definition in order to receive this benefit," and that "[f]uture medical updates on [her] continuing disability status will be required on an annual or as needed basis." (Def.'s Ex. 1).

---

[1] The record indicates that Arnold's claim for LTD benefits was also approved.

2

On May 31, 2006, LINA sent Arnold a disability questionnaire and activities of daily living form for her to complete. On the questionnaire, Arnold indicated that she does not have the stamina to work "because of [her] lung transplant and [the] medications [she takes] to survive." (R. at 876).[2] When asked to identify any doctors that she had been seeing on a regular basis, Arnold listed Dr. Scott Palmer, her pulmonologist at Duke, and Dr. Maher Baz, a pulmonologist in Gainesville, Florida. LINA subsequently contacted both physicians and requested Arnold's medical records dating back to January 1, 2005.

The records submitted by Dr. Palmer, in response to LINA's request, indicate that he examined Arnold on March 10, 2005. At that time, Arnold was doing "generally . . . well," and she was not experiencing any respiratory problems. (R. at 817). Likewise, Dr. Palmer's notes from a June 9, 2005 follow-up examination indicate that Arnold "was doing well without significant complaints." (R. at 815). At some point following the June 9, 2005 appointment, Arnold suffered from rectal prolapse, for which she underwent a rectosigmoidectomy on January 9, 2006. On January 5, 2006, Arnold had another follow-up appointment with Dr. Palmer. Dr. Palmer's examination notes indicate that Arnold's $FEV_1$ was stable at that time, and that she had no signs of acute or chronic allograft rejection. Arnold returned to Dr. Palmer on May 4, 2006, at which time Dr. Palmer noted that Arnold had "generally done well since [he] last saw her," that she had "done extremely [well] from her respiratory standpoint," and that she had "no respiratory complaints." (R. at 798). On August 3, 2006, Dr. Palmer completed a physical ability

---

[2] Although Arnold did not date the questionnaire when she completed it, Arnold signed and dated an accompanying disclosure authorization form on June 13, 2006.

3

assessment form, on which he indicated that Arnold could only occasionally sit, stand, and walk, and that she "qualifies for 100% medical disability." (R. 795-796).

The medical records submitted by Dr. Baz, in response to LINA's request, included the results of a chest x-ray performed on May 18, 2006, which revealed no abnormalities. (R. at 789). Similarly, a transbronchial lung biopsy, performed on May 31, 2006, showed no evidence of allograft rejection. (R. at 765-768).

On October 17, 2006, Arnold underwent a functional capacity evaluation ("FCE") at LINA's request. The physical therapist who performed the FCE determined that Arnold was capable of performing light work. The physical therapist noted that Arnold was able to walk on the treadmill for 20 minutes at a pace of 1.5 to 2 miles per hour, and that she demonstrated the ability to stand on a frequent basis. (R. at 740).

LINA also arranged for surveillance of Arnold, which occurred during the week of October 16, 2006. On October 16, 2006, Arnold was observed entering the Mid Florida Eye Center in surgical scrubs.[3] She remained at the Eye Center until after 5:00 p.m. Arnold was observed going to a medical appointment the next morning. She stopped at an Orlando Ale House following the appointment and later ate lunch with a friend at another restaurant. Two days later, on October 19, 2006, Arnold was observed reporting to the Mid Florida Eye Center around 8:30 a.m. She left the building for lunch and returned to complete an eight-hour day.

Because the surveillance report suggested that Arnold was working at the Mid Florida Eye Center, LINA initiated contact with the Eye Center. On November 28, 2006, the Eye Center

---

[3] The court notes that the Mid Florida Eye Center is, at times, referred to as the "Mid Florida Surgery Center" in the record.

4

confirmed that Arnold was employed as a part-time employee, and that she had been hired on June 26, 2006.[4]

On November 27, 2006, Arnold underwent a Transferrable Skills Analysis ("TSA") at LINA's request. Relying primarily on the results of the FCE, the rehabilitation specialist who performed the TSA concluded that Arnold could perform her past work as a clinical education specialist, and that she could also work as a medical equipment sales representative.

On December 6, 2006, Dr. Palmer drafted a letter in which he opined that Arnold "should be considered totally and fully disabled due to multiple chronic health problems." (R. at 679). To support his opinion, Dr. Palmer noted that while Arnold had previously "attained reasonably good pulmonary function with an $FEV_1$ of up to 2 liters," her most recent clinical findings, from November 30, 2006, were suggestive of bronchiolitis obliterans syndrome, including a diminished $FEV_1$ and a "severe diminution of her mid air flow." (R. at 679). Dr. Palmer emphasized that bronchiolitis obliterans is the "pulmonary-specific manifestation of chronic allograft rejection," and that "[o]nce this develops most patients experience a steady downward and progressive drop in their lung function." (R. at 679). Based on this and other problems associated with Arnold's cystic fibrosis, Dr. Palmer opined that Arnold "should be considered fully disabled." (R. at 679).

On December 12, 2006, LINA terminated Arnold's waiver of premium coverage on the basis that she no longer met the policy's definition of disabled. In summarizing its decision, LINA explained as follows:

---

[4] According to Arnold's brief, Arnold subsequently stopped working at some point in December of 2006, allegedly based upon the renewed advice of Dr. Palmer.

5

> In reviewing your claim, Life Insurance Company of America
> considered your claim file as a whole for purposes of determining
> your entitlement for continued Waiver of Premium coverage.
> Upon your return to work part-time on June 26, 2006, you no
> longer met the [group life insurance policy's] definition of
> disability. Based on the FCE results indicating a light work
> capacity, the Transferable Skills Analysis which identified
> occupations you are capable of performing, and confirmation that
> you have been working at a part-time job with Mid-Florida Surgery
> Center since June 26, 2006, you are not disabled to performing any
> occupation and do not meet the Waiver of Premium Definition of
> Disability as defined above. Therefore, you do not qualify for
> continued Waiver of Premium coverage and your Waiver of
> Premium claim has been closed as of December 7, 2006.

(Def.'s Ex. 2). LINA further explained that its Nurse Case Manger had reviewed Dr. Palmer's December 6, 2006 opinion letter, and that she had advised LINA that Dr. Palmer's opinion was "inconsistent with [Arnold's] monitored activity level which included that [she had] been working part-time since June 26, 2006." (Def.'s Ex. 2).

On November 24, 2008, Arnold filed the instant action seeking reinstatement of her waiver of premium coverage. The parties subsequently filed cross-motions for summary judgment, which were heard on May 12, 2009. The motions are now ripe for review.

## Standard of Review

The termination of benefits under an ERISA plan must be reviewed de novo by the court, unless the plan gives the administrator or fiduciary discretionary authority to construe the terms of the plan or to determine eligibility for benefits. Woods v. Prudential Ins. Co. of America, 528 F.3d 320, 322 (4th Cir. 2008) (citing Firestone Tire & Rubber Co. v. Burch, 489 U.S. 101, 115 (1989)). In this case, it is undisputed that the policy at issue does not give the administrator discretionary authority to determine eligibility for benefits, and thus, that the standard of review

is de novo. Accordingly, in reviewing the termination of Arnold's waiver of premium coverage, the court owes no deference to LINA's decision. See Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir. 1996).

## Discussion

As stated above, the relevant terms of the life insurance policy provide that an employee's waiver of premium coverage ends when the employee is no longer disabled, and that an employee must provide satisfactory proof that she remains disabled in order to retain the waiver of premium coverage. For the following reasons, the court concludes that Arnold failed to prove that her disability continued throughout 2006, and thus, that LINA properly terminated her waiver of premium coverage.

Under the terms of the life insurance policy, an employee is "disabled" if, "because of [s]ickness or [i]njury, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience." (R. at 945). In moving for summary judgment, Arnold argues that this definition is ambiguous, and that it can be reasonably interpreted to mean that an policyholder is disabled as long as she is "incapable of performing all the material duties of any occupation proximate to the policyholder's former position." (Pl.'s Br. at 5-6). Applying this suggested interpretation, Arnold contends that she remained disabled throughout 2006, even when she worked part-time at the Mid Florida Eye Center performing "strictly ministerial tasks" such as data entry and bookkeeping. (Pl.'s Br. at 3). For the following reasons, however, the court disagrees.

7

While the court recognizes that ambiguous language in an ERISA plan must be "construed against the drafter" and "in accordance with the reasonable expectations of the insured," Bynum v. CIGNA Healthcare of N.C., Inc., 287 F.3d 305, 313-314 (4th Cir. 2002), the court is unable to conclude that the instant policy's definition of the term "disabled" is reasonably susceptible to the interpretation advanced by Arnold. As LINA emphasizes in its brief, the definition does not differentiate between part-time work and full-time work, or in any way suggest that the inability to perform all of one's former job duties renders a person disabled. Instead, a claimant is rendered disabled only if she is unable to perform all of the material duties of "any occupation for which . . . she may reasonably become qualified based on training, education, or experience." (R. at 945) (emphasis added).[5] Applying the plain meaning of the phrase "any occupation," the court concludes that the phrase unambiguously encompasses all occupations for which a claimant may reasonably become qualified, regardless of whether they are performed on a full-time or part-time basis. Simply stated, an employee is not disabled, for purposes of the policy, unless she is unable to perform any full-time or part-time job for which she may become reasonably qualified through training, education, or experience.

This interpretation is consistent with decisions from other courts that have considered similar disability definitions, including the United States Court of Appeals for the Fourth Circuit. See, e.g., Donnell v. Metro. Life Ins. Co., 165 F. App'x. 288, 293 (4th Cir. 2006) (holding that the phrase "any gainful work or service" encompasses "all work performed for income, without

---

[5] The court notes that even if the policy's definition of "disabled" could be considered ambiguous to the extent that it refers to any occupation for which an employee "may reasonably become qualified based on education, training, or experience" (R. at 945) (emphasis added), the resolution of such ambiguity would not affect the disposition of the instant case.

8

regard to whether it is performed full or part-time"); Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998) (holding that the capacity to work part-time supported a finding that the claimant was not "totally disabled from any occupation"); Graeber v. The Hewlett Packard Co., 421 F. Supp. 2d 1246 (N.D. Cal. 2006) (holding that the plaintiff was not "unable to perform any occupation," since he was capable of working part-time); Shane v. Alberton's Inc. Employees' Disability Plan, 381 F. Supp. 2d 1196, 1205-1206 (C.D. Cal. 2005) (rejecting the plaintiff's argument that the phrase "any gainful occupation" requires an employee to be able to work full-time); Billinger v. Bell Atlantic, 240 F. Supp. 2d 274, 283-284 (S.D. N.Y. 2003) (sustaining a plan administrator's determination that the claimant was not prevented from engaging in "any occupation or employment for which the employee is qualified," since the record contained evidence suggesting that the plaintiff could return to sedentary work on at least a part-time basis); Mullaly v. First Reliance Std. Life Ins. Co., 253 F. Supp. 2d 279, 283 (D. Conn. 2003) (holding that the phrase "any gainful occupation" encompasses both full-time and part-time work).

Applying this plain language interpretation of the policy's disability definition, the court concludes that Arnold failed to prove that she was continuously disabled throughout 2006. While Arnold's treating physician, Dr. Palmer, opined in August and December of 2006 that Arnold was totally disabled, his opinion is clearly contradicted by the fact that Arnold held a

9

part-time job for more than five months during the second half of that year.[6] Indeed, the court agrees with LINA that the fact that Arnold worked part-time for more than five months, admittedly for as many as eight hours per day and 27 hours per week, clearly demonstrates that she was not, at all relevant times, completely incapable of performing the material duties of "any occupation" for which she may reasonably become qualified. (R. at 945). Additionally, other evidence in the record, namely the FCE and the surveillance report, strongly supports LINA's determination that Arnold was no longer disabled for purposes of the life insurance policy. Accordingly, the court concludes that LINA did not err in terminating Arnold's waiver of premium coverage in December of 2006.[7]

---

[6] In her summary judgment brief, Arnold emphasized that her CIGNA Group insurance case manager had advised her in April of 2003 that part-time employment would not necessarily prevent her from continuing to receive LTD benefits, and that she had "assumed" that the waiver of premium coverage under her life insurance policy would be similarly unaffected by part-time employment. (Pl.'s Br. at 2). However, Arnold's counsel acknowledged at the summary judgment hearing that Arnold did not specifically inquire with the case manager regarding her waiver of premium coverage, that the two policies involve different disability standards, and thus, that he did not believe that he had a good faith basis for making an equitable estoppel argument. Indeed, the Fourth Circuit has held that "equitable estoppel is not available to modify the written terms of an ERISA plan in the context of a participant's suit for benefits." Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1027 (4th Cir. 1997) (citing Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 58-60 (4th Cir. 1992)).

[7] In reaching this decision, the court recognizes that Arnold's condition quickly deteriorated after her waiver of premium coverage was terminated. Nonetheless, even if Arnold now meets the life insurance policy's definition of disabled, she is not entitled to relief. As LINA explains in its brief, the policy does not provide for reinstatement of the waiver of premium coverage upon recurrence of disability.

10

## Conclusion

For the foregoing reasons, the court's de novo review of the record confirms that LINA's decision to terminate Arnold's waiver of premium coverage was proper. Accordingly, the court will deny Arnold's motion for summary judgment and grant LINA's motion for summary judgment.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 2d day of July, 2009.

*/s/ Glen Conrad*
United States District Judge